IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2010

**STATE OF TENNESSEE v. KENNETH CLAY**

**Direct Appeal from the Circuit Court for Lake County**
**No. 08-CR-9224     R. Lee Moore, Jr., Judge**

---

**No. W2009-02314-CCA-R3-CD  -  Filed March 15, 2011**

---

A jury convicted the defendant, Kenneth Clay, of two counts of facilitation of the sale of less than .5 gram of cocaine, Class D felonies. The trial court sentenced the defendant, as a career offender, to concurrent twelve-year sentences for each count. On appeal, the defendant argues that (1) the evidence was insufficient to convict him of facilitation of the sale of a Schedule II narcotic less than .5 gram; (2) the court erred by admitting evidence of the defendant's prior convictions for the sale of Schedule II narcotics; and (3) the statutes under which the court sentenced him are unconstitutional as applied to him. After reviewing the record, the parties' briefs, and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

James E. Lanier, District Public Defender, and Patrick McGill, Assistant Public Defender, Dyersburg, Tennessee, for the appellant, Kenneth Clay.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Phillip Bivens, District Attorney General; and Rachel Willis and Lance Webb, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Background**

The Lake County Grand Jury indicted the defendant, Kenneth Clay, on two counts of the sale of less than .5 gram of cocaine, Class C felonies. The trial court held a jury trial on August 28, 2009, at which the parties presented the following evidence.

Robert Harrison, with the West Tennessee Violent Crime and Drug Task Force, testified that the task force ran undercover drug operations in the 28th, 29th, and 30th judicial districts using controlled purchases. He explained that a controlled purchase was when they used a confidential source or an undercover officer to make undercover drug purchases from specific people or in specific areas.

Agent Harrison stated that when executing a controlled purchase, the drug task force officers meet "at a hidden location" with the person making the purchase. At the hidden location, the officers search the informant's vehicle for money, drugs, and other contraband that would "come into question in the case." Next, they wire the vehicle, and often the informant, to record audio and video. The officer try "to stay close enough that [they] can . . . at all times know what's going on with [the informant]." Even if the officers cannot see the informant, the wiring allows them to hear the transaction. After wiring the informant, the officers give the informant money to make the purchase and send him or her out to make the purchase. After the informant completes the purchase, he or she meets with the task force, and the task force immediately searches the informant to ensure that they do not leave any drugs in the car and that the informant does not have drugs left on him or her. Finally, the informant returns and remaining money to the officers.

On July 23, 2008, the task force worked with a confidential informant, Mike Cole. According to Agent Harrison, Mr. Cole had done "a lot of undercover work through the years." He estimated that Mr. Cole worked "between 50 and 100" cases. Mr. Cole also worked as an informant with other law enforcement agencies. To Agent Harrison's knowledge, Mr. Cole did not have a criminal record or any pending charges, and he was just helping the task force for the money. Agent Harrison was present when other officers searched Mr. Cole. Agent Harrison testified that he was familiar with the street value of crack cocaine. Agent Harrison gave Mr. Cole $70 to purchase the drugs. He said that the price of cocaine had risen, and one could purchase between .1 and .3 grams for $40.

After Agent Harrison gave Mr. Cole money to purchase the drugs, the officers sent him out to make the purchase. They followed Mr. Cole, in an undercover car, "to the Meadows area of town, over on Moss Street, Emmett Lewis Circle and that area of town." The officers stopped "about a block away" from where Mr. Cole made the transaction; however, the officers were unable to observe it where they were. Agent Harrison said that the equipment was working, and they could hear the transaction. After the transaction, Mr. Cole and the officers met so the officers could retrieve the evidence.

Agent Harrison said that he was not the person who originally collected the evidence from Mr. Cole, but he eventually received the evidence. Agent Harrison testified that he brought the evidence to the Tennessee Bureau of Investigation (TBI) crime lab. Later, he retrieved it from the lab and placed it in the drug vault. Agent Harrison brought the evidence to court for the trial and identified it during his testimony.

Agent Harrison was not involved in the September 22, 2008, transaction; however, after it took place, he received the evidence from Officer Tim McCree. After receiving the evidence, Agent Harrison brought it to the TBI crime lab for testing. Agent Harrison brought the evidence to the trial and identified it for the court.

Agent Harrison testified that Mr. Cole received compensation for the work that he did for the task force. He stated that Mr. Cole received $75 from the task force for helping them on July 23. The outcome of the defendant's trial did not affect Mr. Cole's compensation. Agent Harrison stated that the task force paid Mr. Cole for his help on the September 22 controlled purchase; however, he was not present and did not know what amount the task force paid Mr. Cole. He stated that the only compensation that the task force gave Mr. Cole for testifying at the defendant's trial was "[j]ust expense money for travel" which included gas and a meal.

On cross-examination, Agent Harrison testified regarding the differences between powder and crack cocaine. He explained that "[p]owder cocaine is in powder form. It's usually whiter or a little off-white. Crack cocaine has been . . . through a process, a cooking process, to make it in a rock-like form that goes into a pipe and is smoked." He said that the two types of cocaine cost "about the same" and said there was no difference between the type of people that use powder cocaine versus crack cocaine. He agreed that both types of cocaine were very addictive and illegal.

Agent Harrison stated that three officers participated in the first controlled purchase, and two officers participated in the second. Agent Harrison also stated that he was unaware that Mr. Cole gave some drugs to the defendant during at least one transaction.

On redirect examination, Agent Harrison stated that the task force instructs its informants

> never to give back any of the substance that they're purchasing. . . . They're instructed to either . . . pay the person some extra money for them to go purchase their own, or pay them for doing the transaction for them, or make sure that if the person comes back to them and has several rocks of crack

cocaine or cocaine and wants some themselves, to make sure that they get their portion of it before they give it to the informant.

Bryan Bargery, an officer with the Ridgely Police Department, testified that he was involved in more than fifty controlled purchases of narcotics. He participated in the July 23 and September 22, 2008, controlled purchases with the West Tennessee Drug Task Force. During the controlled purchases Officer Bargery was responsible for setting up the audio and video equipment. He also searched Mr. Cole before and after the transaction. He testified that, before the transactions, Mr. Cole did not have anything that he was not supposed to have on his person. After the transactions, Mr. Cole did not have any drugs or money on his person other than what he surrendered for evidence.

Officer Bargery stated that he placed a "mobile cam" on Mr. Cole's person. He also placed inside the vehicle a "passenger cam," which captured the view of the passenger's side of the vehicle, and a camera that viewed the driver's side of the vehicle. Officer Bargery identified the videos that the cameras recorded on July 23 and September 22, and the state entered the recording into evidence.

On cross-examination, Officer Bargery testified that he was "not exactly sure" of the difference between crack cocaine and powder cocaine. He stated that he believed crack cocaine was more addictive but did not know whether crack cocaine was a "poor person's drug." Officer Bargery could not say with certainty whether powder cocaine typically costed more than crack cocaine.

Mike Cole testified that he did a controlled purchase for the West Tennessee Drug Task Force on July 23, 2008. Before July 23, Mr. Cole had done between 600 and 700 controlled purchases of crack cocaine. He stated that he recognized crack cocaine when he saw it and was familiar with its street value. When Mr. Cole made controlled purchases, he usually bought $40 worth, which would be enough to purchase "at least two decent pretty good size rocks."

On July 23, Mr. Cole was working with Agent Harrison, Officer Bargery, and Officer Tim McCree. He stated that the task force did not ask him to target a specific seller and told him "[j]ust to go out and make a street level buy." He stated that the officers searched him and his vehicle before he went out to make the controlled purchase, and they wired both him and his vehicle with recording and transmitting equipment. He stated that Agent Harrison gave him $70 to make the purchase.

Mr. Cole testified that he went to Moss Street in Tiptonville, Tennessee to make the purchase. When he arrived on Moss Street, Mr. Cole saw the defendant and told him that he

-4-

"wanted a 40." He said that the defendant went and got him a "40." Mr. Cole testified that the defendant wanted a piece of the rocks that he brought back to him, but he gave him $5 instead. According to Mr. Cole, the rocks looked like crack cocaine. He stated that he drove the defendant somewhere so that the defendant could get the drugs. When they reached their destination, the defendant gave Mr. Cole his identification in exchange for the money to purchase the drugs. Mr. Cole said that the defendant's picture was on the identification; however, the name was different. When the defendant returned, he gave Mr. Cole two rocks of crack cocaine, and Mr. Cole returned the defendant's identification and gave him $5 for his time. After purchasing the drugs, Mr. Cole met with the task force officers. He gave them the drugs that the defendant had given him and returned the remaining $25 to them.

Mr. Cole also did a controlled purchase for the task force on September 22, 2008. He said that the officers went through the same procedure of searching him and wiring him and his vehicle. They gave him $35 with which to purchase drugs from anyone whom he could find. He identified the defendant as the person from whom he purchased drugs. He told the defendant that he "wanted a 30," and the defendant agreed to get it for him. The defendant did not have the crack cocaine on his person, and they went to a home to get it. At the home, the defendant told Mr. Cole to back into the driveway. Mr. Cole stated that a woman and a man were sitting on the home's front porch. Mr. Cole gave the defendant $30 to get the crack cocaine. Mr. Cole said that the man on the porch told him that he would have to pay $5 to park in the driveway, and Mr. Cole gave him the remaining $5. When the defendant returned, he had two rocks. He gave Mr. Cole the biggest rock and kept the smaller one because Mr. Cole did not have the $5 to give him. Mr. Cole said that the defendant took his rock before he gave Mr. Cole his rock. After the transaction, Mr. Cole immediately rejoined the officers. The officer searched him again, and Mr. Cole gave them the rock that the defendant had brought him.

Mr. Cole testified that the task force paid him $75 in exchange for his participation in each of the controlled purchases. He said that he expected the task force to reimburse him for his traveling expenses for having to testify in court but did not expect anything else. He stated that his compensation would be the same despite the outcome of the trial. He stated that he did not have criminal charges pending against him when he worked with the task force or during the trial. Before July 23, 2008, Mr. Cole did not know the defendant. Mr. Cole testified that between July 23 and September 22, he did not have any contact with the defendant.

On cross-examination, Mr. Cole testified that the defendant did not know that he was working with the West Tennessee Drug Task Force. He stated that he did not know from where the defendant got the drugs on July 23 and denied giving the defendant drugs on that

date. Mr. Cole further denied that the defendant took the drugs from his hand on September 22.

On redirect examination, Mr. Cole testified that it was not usual that the defendant did not have the crack cocaine on his person when he first approached him to make the purchase. According to Mr. Cole, "[a] lot of times [the sellers] won't have it on them." Mr. Cole said that although the sellers did not have it on their person, it did not take long for them to get it.

Dana Parmenter, a special agent forensic scientist in the controlled substance identification section of the TBI, testified that, on August 4, 2008, the TBI received evidence relating to the defendant's case. Agent Parmenter analyzed the evidence on August 18, 2008. She identified the package that contained the evidence and said that it contained "a rock-like substance that contained cocaine." She determined the substance was cocaine by administering a chemical color change test and instrumental analysis. Agent Parmenter also administered a gas chromatograph mass spectrometer analysis that likewise determined the substance was cocaine. She said that the substance weighed .1 gram. Agent Parmenter put her findings in a report, which the state made an exhibit at trial. After she analyzed the substance, she put it in a sealed evidence bag and placed it in the vault until Agent Harrison came to get it.

On October 9, 2008, Agent Parmenter received another evidence bag from Agent Harrison that contained evidence for the defendant's case. She tested the evidence on October 20, 2008. The envelope contained a rock-like substance that she later determined was .1 gram of cocaine. To find out what the substance was, Agent Parmenter did the same tests that she did on August 18. The state made an exhibit of her report based on the October 20 tests. After she tested the substance, she placed it back in the evidence bag and stored it in the vault until Agent Harrison retrieved it.

Officer Timothy McCree of the Tiptonville Police Department testified that he worked with the West Tennessee Drug Task Force on July 23, 2008. He said that Mr. Cole gave him the substance that he purchased during the controlled purchase. Officer McCree field tested the substance, and it tested positive for cocaine. He then put the evidence in an evidence back and put the case identifying information on the bag. After he sealed the bag, he gave it to Agent Harrison. Officer McCree identified the evidence bag that contained the cocaine from the July 23 controlled purchase, and the state entered it into evidence.

Officer McCree also worked with the task force during the September 22, 2008, controlled purchase. After that controlled purchase, Mr. Cole again gave him the substance that he had purchased, which tested positive for cocaine. Officer McCree sealed the cocaine

in an evidence bag and gave it to Agent Harrison. Officer McCree identified the evidence bag that contained the cocaine that Mr. Cole purchased on September 22, and the state entered it into evidence. During Officer McCree's testimony, the state played portions of the video recordings for the jury.

Before the defendant's case-in-chief the court held a *Morgan* hearing to decide whether it would allow the state to mention the defendant's prior convictions for burglary and drug sales. The state argued that the burglary conviction related to the defendant's credibility and that the drug sale convictions would refute the defendant's contention that he was just a user and did not sell drugs. The defense argued that the drug sale convictions were highly prejudicial because the convictions were for the same crime with which the state was charging the defendant. The trial court allowed the state to impeach the defendant with two 1995 convictions for sale of cocaine less than .5 gram, a 1999 burglary conviction, two 1994 theft convictions, and two 1994 burglary convictions if the defendant testified that his transaction with Mr. Cole was a casual exchange rather than a sale.

The defendant, Kenneth Clay, testified that he had two convictions for selling cocaine in 1993. He pleaded guilty to those charges, but he denied that he was a seller. According to the defendant, he "was supporting [his] habit" and was not a seller. The defendant stated that he "ain't [sic] never been a seller." The defendant admitted that he had 1994 convictions for two burglaries and two thefts in addition to a 1999 burglary conviction. The defendant said that these convictions were due to his drug addiction.

Regarding the charges for which he was on trial, the defendant explained, "[I was] sitting in a dope house and this guy [came] along . . . [and] he wanted some dope, and I wanted a hit, so I went and got him some dope." He said that the drugs were not his, and he did not receive a profit from the controlled purchases. He further said that the only thing he received from the controlled purchase was drugs. The defendant said that he had previously seen Mr. Cole at the "dope house."

The defendant testified that he had been addicted to drugs since he was fifteen years old, and he associated with drug addicts. He did not deny that he was the person in the videos that the task force recorded. The defendant said that he wanted to jury to see the video because "it just simply shows . . . when you've got to run around and look and . . . run here and there . . . chasing down dope . . . for someone else . . . that don't [sic] make me a dealer . . . ." The defendant stated that, after the first controlled purchase, Mr. Cole gave him "a piece of dope" and $5. He further stated that after the second controlled purchase he gave Mr. Cole all of the drugs, and he got a little piece of the drugs after Mr. Cole told him to get what he wanted.

On cross-examination, the defendant agreed that the facts surrounding his previous sale of cocaine convictions were that he "took the money, went somewhere else, got the cocaine[,] and brought it back in order to get [him]self some cocaine[.]" The defendant said that on July 23 and September 22, he got the drugs from a man he called "Big D."

After hearing the evidence, the jury convicted the defendant of two counts of the lesser included offense of facilitation of the sale of less than .5 gram of cocaine, Class D felonies. The trial court sentenced him as a career offender to a twelve-year sentence for each count and ordered the defendant to serve them concurrently for an effective twelve-year sentence in the Tennessee Department of Correction. The defendant timely appeals his convictions and sentences.

**Analysis**

*Sufficiency of Evidence*

The defendant contends that the evidence was insufficient to support his conviction because, when examining the totality of the circumstances, the amount of drugs that he allegedly transferred shows that he was not selling drugs. He claims that the amount of drugs that he transferred suggests that he did a favor to secure drugs for his personal use.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

To establish the defendant's guilt of facilitation of sale of less than .5 gram of cocaine, the state had to prove beyond a reasonable doubt that the defendant knew that another person intended to commit the offense of the sale of less than .5 gram of cocaine and "knowingly furnishe[d] substantial assistance in the commission of" the sale of cocaine "but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2)." Tenn. Code Ann. § 39-11-403(a). "It is an offense for a defendant to knowingly: (1) Manufacture a controlled substance; (2) Deliver a controlled substance; (3) Sell a controlled substance; or (4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a).

In the light most favorable to the state, we conclude that evidence exists that reasonable jurors could accept as to the lesser-included offense of facilitation, and the evidence was legally sufficient to support convictions for facilitation of the sale of cocaine. The evidence showed that on July 23, 2008, and September 22, 2008, Mr. Cole, the undercover informant, bought cocaine through the defendant. On both occasions, Mr. Cole told the defendant he wanted to purchase cocaine, gave the defendant money for cocaine, and the defendant got cocaine from someone else and gave it to Mr. Cole. The defendant testified that by retrieving cocaine for Mr. Cole he could get some cocaine for himself. The defendant admitted he was on the surveillance video but contended that he was simply a drug addict who facilitated the transactions so he could get drugs for himself. By the defendant's own admission, he twice knowingly furnished substantial assistance in the commission of the sale of cocaine and benefitted from the commission of each felony. We conclude that the evidence was sufficient to support the defendant's convictions of facilitation of the sale of cocaine, and the defendant is without relief as to this issue.

*Admission of Prior Convictions*

Next, the defendant argues that trial court erred when it allowed the state to use his prior convictions for the sale of Schedule II narcotics under Rule 404(b) of the Tennessee Rules of Evidence. Specifically, the defendant argues that the admission of proof of his prior convictions for the sale of cocaine was to "allow jurors to presume that if he dealt drugs in the past, he was still a drug dealer."

Rule 404(b) of the Tennessee Rules of Evidence provides that:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes.

A trial court's decision on an issue falling under Rule 404(b) is subject to an abuse of discretion standard. "Where the admissibility of the proffered evidence must also comply

with Rule 404(b) and the trial court has followed the procedure mandated by that rule, it appears that the same standard, abuse of discretion, would be applicable." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (citing *State v. Brewer*, 932 S.W.2d 1, 24 (Tenn. Crim. App. 1996)). "Although evidence of a prior act is not admissible to prove propensity or disposition to commit a crime, it may arguably be relevant to issues such as identity, intent, motive, or rebuttal of accident or mistake." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., at Jackson, June 27, 2001); *see also* Tenn. R. Evid. 404, Advisory Comm'n Cmnts. To admit such evidence, Rule 404(b) specifies the following:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002); *Dubose*, 953 S.W.2d at 652.

In the instant case, we note that the trial court complied with the procedural steps announced in Rule 404(b) and held a hearing outside the jury's presence. During that hearing, the defendant stated that he intended to testify. The defense said that the defendant's testimony would be that he was not a drug dealer, and the transaction between him and Mr. Cole was simply a casual exchange. The court determined that a material issue existed other than conduct conforming with a character trait because the defendant's position was that he was simply a drug addict and did not sell drugs. The defendant's assertion created the issue of whether the defendant did the transaction as a drug sale or a casual exchange. The court allowed the state to present evidence of the defendant's prior convictions for the sale of cocaine to rebut the defendant's claim that the transaction was a casual exchange. The trial court allowed the defendant's prior convictions for burglary and theft into evidence because they related to the defendant's credibility.

We detect no abuse of discretion by the trial court in allowing the evidence of the defendant's prior convictions at trial. In this case, the defendant's credibility was at issue because he testified in his own defense; therefore, any evidence, such as the defendant's

burglary convictions, regarding his credibility was probative. Additionally, the state offered the defendant's prior convictions for the sale of cocaine testimony to rebut the defendant's assertion that he was only a drug user and to show his intent. *See, e.g., State v Samuel L. Giddens,* M2002-00163-CCA-R3-CD, 2004 WL 2636715, at*3 (Tenn. Crim. App., at Nashville, Nov. 15, 2004). Therefore, we conclude that the trial court did not err in admitting the defendant's prior convictions for the sale of cocaine into evidence under Tennessee Rule of Evidence 404(b).

*Sentencing*

Finally, the defendant argues that Tennessee Code Annotated sections 40-35-107 and 40-35-101 are unconstitutional as applied to his case because they violate the Eighth Amendment to the United States Constitution's protection against cruel and unusual punishment. The defendant claims that he "must serve more time before being eligible for parole because a jury of his peers believed he was guilty of a lesser crime." He contends that his sentence is cruel and unusual because if the jury convicted him of selling a Schedule II controlled substance as charged his release eligibility would have been 6.75 years, but because the jury convicted him of the lesser included offense of facilitation, his release eligibility is 7.2 years.

The Eighth Amendment of the United States Constitution forbids cruel and unusual punishment, and the United States Supreme Court has interpreted this provision to mean that a sentence must be proportional to the underlying offense. *State v. Harris*, 844 S.W.2d 601, 602 (Tenn. 1992) (citing *Weems v. United States*, 217 U.S. 349, 347 (1910)). The Tennessee Supreme Court has said that the similarity in language between the federal constitution and Article I, section 16, of the state constitution "does not foreclose a more expansive interpretation of the Tennessee constitutional provision." *Id*. at 603. The state supreme court also noted that "because reviewing courts should grant substantial deference to the broad authority legislatures possess in determining punishments for particular crimes, '[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare.'" *Id*. at 602 (quoting *Solem v. Helm*, 463 U.S. 277, 289-90 (1983) (emphasis in original)). When determining if a punishment is cruel and unusual, this court considers (1) whether the punishment for the crime conforms with contemporary standards of decency; (2) whether the punishment is grossly disproportionate to the offense; and (3) whether the punishment goes beyond what is necessary to accomplish any legitimate penal objective. *State v. Black*, 815 S.W.2d 166, 189 (Tenn. 1991) (quoting *State v. Ramseur*, 524 A.2d 188, 210 (N.J. 1987)).

Regarding the first factor, the trial court sentenced the defendant as a career offender to an effective twelve-year sentence. This sentence conforms with the contemporary standards of decency. Many states have enacted laws that provide enhanced sentences for

-11-

repeat offenders. *See Ewing v. California*, 538 U.S. 11, 24 (2003). Moreover, courts have long recognized recidivism as a legitimate basis for increased punishment. *Id.* at 25.

The second prong of our analysis is whether the punishment is grossly disproportionate to the crime. "[O]nly an extreme disparity between crime and sentence offends the Eighth Amendment." *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). The defendant correctly points out that had the jury convicted him of the greater crime, the court would have classified him as a persistent offender, and his release eligibility would have been .45 years earlier than his release eligibility for his conviction of the lesser included offense. However, the difference between the release eligibility is a result of the defendant's lengthy criminal history that includes fourteen prior convictions. Furthermore, there is no guarantee that the parole board will grant a defendant parole. *See Hopkins v. Tenn. Bd. of Paroles & Prob.*, 60 S.W.3d 79, 82 (Tenn. Ct. App. 2001). "A release eligibility date simply, and merely, provides a date after which a defendant is entitled to be considered for early release on parole." *Davis v. State*, 313 S.W.3d 751, 757 n. 5 (Tenn. 2010). The defendant's sentence for the lesser included offense of facilitation, which had a release eligibility date .45 years greater than the sentence for the greater crime, is neither grossly disproportionate nor an extreme disparity and does not violate the Eighth Amendment.

Finally, the persistent and career offender statutes do not go beyond what is necessary to accomplish any legitimate penal objective.

> The purpose of the sentencing statutes is to promote justice. Among the sentencing principles designed to promote that purpose are the principles of preventing crime and promoting respect for the law by providing a deterrent to those likely to violate the law and incarcerating defendants who commit the most severe offenses. Furthermore, the legislature has a legitimate interest in protecting citizens from crime as a part of the state's police power.

*State v. Wyrick*, 62 S.W.3d 751, 792 (Tenn. Crim. App. 2001) (citations omitted) The sentencing guidelines reflect "continuing legislative intent to incarcerate those with lengthy criminal records," and prior cases repeatedly held that habitual offender statutes do not violate the constitutional protection against cruel and unusual punishment. *See State v. Russell*, 866 S.W.2d 578, 581 (Tenn. Crim. App. 1991).

After considering all three prongs, we conclude that the defendant's sentence is not cruel and unusual and does not violate the Eighth Amendment. Therefore, the defendant is not entitled to relief on this issue.

**Conclusion**

Based on the foregoing, we affirm the judgment of the trial court.


_____
J.C. McLIN, JUDGE